GUARANTEE GOLD BOND, LOAN & SAVINGS CO. VS EDWARDS ET AL

Opinion rendered Sept. 26, 1907.

(104 S. W. Rep. 624).

1. *Referee's Report—Exceptions.*

By Mansf. Dig. § 5273 (Ind. Ter. Ann. St. 1899, § 3478) exceptions may be allowed to a master's report where incompetent testimony was admitted or competent testimony excluded, or for any cause which the court holds sufficient or when from the face of the report it is apparent justice has not been done.

2. *Same—Effect and Conclusiveness.*

By Mansf. Dig. § 5272 (Ind. Ter. Ann. St. 1899, § 3477) a master's report in so far as it is not excepted to stands good unless the evidence or face of the report shows it to be erroneous. Under common law the findings of a master's report are advisory to the court.

3. *Mortgages—Evidence.*

It was not error to dismiss the intervener's petition in an action to have an instrument in the form of a deed declared a mortgage, where the intervener petitioned that the rights and liabilities of all parties be adjudged and the court decreed that the instrument was a mortgage, the deed having been secured by fraud.

4. *Appeal—Petition.*

It is too late to raise the contention, that an intervening petition, not being answered or demurred to should be accepted as true, when the case has been appealed and is on trial.

Appeal from the United States Court for the Western District of the Indian Territory; before Justice Wm. R. Lawrence, May 17, 1906.

Action by Rachel A. Edwards and others against the Guarantee Gold Bond, Loan & Savings Company, in which G. M. Swanson intervenes. From a decree for plaintiffs, defendant and the intervener appeal. Affirmed.

On the 12th day of September, 1905, the original complaint in equity was filed, and on February 23, 1906, an amended complaint was filed, in which the plaintiffs below appellees here, allege that plaintiff Rachel A. Edwards, nee Rachel A. Walker, was legally married to Silas Edwards on the ———— day of ————, 1900, in the Western District of the Indian Territory; that defendant below, appellant here, is a corporation duly organized. Allege, further, that on the 7th day of September, 1905, the plaintiffs, Rachel A. Edwards and Silas Edwards, her husband, called upon the Guarantee Gold Bond, Loan & Savings Company, defendant, to procure a loan from said defendant of $300 for one year, for the use of which plaintiffs agreed to pay defendant $50 interest; that plaintiffs agreed to give defendant a mortgage on 40 acres of land, said land being the property of Rachel A. Edwards, and being a part of the land allotted to Rachel A. Edwards, nee Walker, by authority of the United States government, and described

as the S. ½ of the N. ½ of the N. E. ¼ of section 29, township 15 N., range 18 E. of the Indian base and meridian of the Indian Territory. They further represent that on the 7th day of September, 1905, they called at defendant's place of business for the purpose of securing said loan of $300. Defendant agreed to accept a mortgage for one year from petitioners, on the above-described land, as security for the loan of $300, and $50 interest, and then and there proceeded to draft, and did draft, an instrument which defendant fraudulently represented to petitioners to be a mortgage on the above-described land for one year, and petitioners, relying on said fraudulent representations, signed the said instrument, believing the same to be a mortgage, and received from defendant the sum of $300. That petitioners at no time intended to execute or give to defendant an absolute warranty deed to the said land, nor to incumber the same for more than said sum of $300. They further represent that on the 12th day of September, 1905, petitioners discovered that said instrument signed by them was in fact a warranty deed, and that petitioners immediately made demand upon said defendant to release petitioners' land from said warranty deed, and to execute in lieu thereof a mortgage, which defendant refused, and still refuses, to do. They allege that same is a cloud upon the title of their land, which may result in irreparable injury, and pray that said warranty deed be canceled and be declared to be a mortgage upon said petitioners' land for the sum of $300, with interest thereon for one year from the date of such warranty deed, and for costs. On the 3d day of March, 1906, defendant the Guarantee Gold Bond, Loan & Savings Company filed their answer to the complaint, denying each and every allegation in plaintiff's complaint.

On the 15th day of January, 1906, said cause was referred to the master in chancery, as follows: "Now, on this day, the 15th of January, 1906, it is ordered by the court that all

equity cases wherein issue has been joined be, and the same are hereby, referred to Clark J. Tisdel, the master in chancery of this court, to take evidence and report with conclusions of law and fact therein." On the 20th day of March, 1906, G. M. Swanson files a petition for leave to be joined as a plaintiff in said cause, and the prayer of the petitioner is granted, and said G. M. Swanson made party plaintiff, to which plaintiff Edwards and the defendant at the time except. Whereupon G. M. Swanson files intervening petition, and alleges that on the 9th day of September, 1905, he bought from Rachel A. Edwards and her husband, Silas Edwards, plaintiffs in the above-styled cause, the same 40 acres of land heretofore described; and further states that said land was conveyed to him by warranty deed; that the consideration for this deed was the sum of $1,200, to be paid by petitioner and intervener to plaintiffs as soon as a settlement should be made with the ·defendant Guarantee Gold Bond, Loan & Savings Company, in regard to the money loaned to plaintiffs by the defendant on the 7th day of September, 1905, to secure which loan of $300, as alleged in plaintiff's complaint, they had executed a deed to defendant; that intervener was to settle with said defendant for any sum not over $600, upon which settlement he was to pay plaintiff the said sum of $1,200 as the entire remainder of the consideration. Said intervener states that the plaintiffs represented to him that said deed to defendant made by them on September 7th was in effect a mortgage, and not a deed. Intervener charges that the plaintiffs, upon the one hand, and the defendant, upon the other, mutually understood that said deed was in effect a mere mortgage, and that they mutually intended for the deed to have the effect of a mere mortgage. Intervener charges that said tract of land on the date of said deed was worth on the market about $2,000, or a little the rise thereof. He also alleges that the recited consideration of $2,450 on the face of said deed made

to defendant by plaintiffs was a fictitious consideration, and entered in the face of the deed without the knowledge or consent of the plaintiffs. Intervener states that he is ready, willing, and prepared to pay to defendant whatever amount of money is due to it as principal and interest on the above said loan made by it to the plaintiff, which money he is ready to bring into court for the purpose of satisfying such decree as the court may render in favor of defendant against the plaintiff on said loan, not to exceed $600, and the $1,200 remainder upon said consideration to plaintiff. Intervener prays that he may be made a party to this case, with a reference to the master, proof taken, and report made, showing fully the nature of said transaction between the plaintiff and the defendant, and said deed executed by the plaintiffs to defendant on September 7th be declared in fact and equity a mortgage to secure the loan of $300.

On the 14th day of April, 1906, the master in chancery, Clark J. Tisdel, files his report, in which he makes the following findings of fact and conclusions and recommendations: "Findings of Fact: (1) That the plaintiff Rachel A. Edwards is a Creek freedman and a citizen of the Creek Nation, and that Silas Edwards is her husband. (2) That as such citizen of the Creek Nation there was allotted and patented to her, out of the lands of said nation, the south half of the north half of the northeast quarter of section twenty-nine, township fifteen north, range 18 east of the Indian base and meridian, containing 40 acres. (3) That the defendant, Guarantee Gold Bond, Loan & Savings Company, is a corporation organized and existing under and by virtue of the law of the United States in force in the Indian Territory, and that its principal place of business is at Muskogee, Ind. Ter. (4) That the parties hereto are residents of the Western judicial district of the Indian Territory. (5) That on September 7, 1905, the plaintiffs executed and delivered unto the defendant,

Guarantee Gold Bond, Loan & Savings Company, a warranty deed to the south half of the north half of the northeast quarter of section twenty-nine, township fifteen north, range eighteen east, situated in the Creek Nation, Ind. Ter., for the stated consideration of $2,450. (6) That the real consideration for the said conveyance was the sum of $600. (7) That said instrument was filed for record in the office of the clerk of the United States Court and ex officio recorder at Muskogee, in this district, on September 8, 1905. (8) That no fraud was practiced upon the plaintiffs, Rachel A. Edwards and Silas Edwards, in the execution of said instrument, and that the parties thereto then and there intended said instrument to be an absolute conveyance of the lands therein mentioned. (9) That the plaintiffs, Rachel A. and Silas Edwards, on September 9, 1905, executed and delivered unto G. M. Swanson a warranty deed upon said premises hereinbefore mentioned. (10) That at the time of the execution of said deed to Swanson the said Swanson had notice of the deed executed by Rachel A. and Silas Edwards to the defendant, Guarantee Gold Bond, Loan & Savings Company. (11) That the recited consideration of said deed to Swanson was the sum of $1 and other valuable considerations, but that no cash consideration passed from said Swanson to the plaintiffs. Conclusions: I am therefore of the opinion and conclude that the warranty deed executed and delivered to the defendant by Rachel A. and Silas Edwards on September 7, 1905, is the valid instrument of the said grantors, and was then and there intended by them to be a warranty deed conveying in fee the premises therein mentioned, and not a mortgage. Recommendations: I therefore recommend that the bill of complaint of Rachel A. and Silas Edwards, and the intervening petition of G. M. Swanson, be dismissed for want of equity. I respectfully ask the court to allow me the sum of $100 for my servicet rendered herein, and the additional sum of $56.10, stenographic fees in taking

and transcribing the evidence and this report.   Respectfully submitted, Clark J. Tisdel, Master in Chancery.   Dated Muskogee, Ind. Ter., April 13, 1906."

On the 18th day of April, 1906, the plaintiffs filed exceptions to the master's report as follows:   "Exceptions to Master's Report in Case No. 6,156, Equity.   Come now Rachel A. Edwards and Silas Edwards, plaintiffs herein named, and by leave of the court file their exceptions to the report of the Honorable Clark J. Tisdel, master in chancery, hitherto filed in this case, and, excepting, say:   First, because said master finds that the real consideration for the· alleged transfer of the title of plaintiffs land to the Guarantee Gold Bond, Loan & Savings Company's Bank was six hundred ($600.00) dollars, and does not find that the transfer was only a mortgage, and the consideration therefor was only three hundred and fifty ($350.00) dollars.   Second.   Plaintiffs further except to master's report wherein he held that no fraud was practiced upon plaintiffs by defendant in securing an absolute conveyance to the land of said plaintiffs, instead of finding -that said instrument was to operate as a mortgage, as such was the true intention of the plaintiffs.   Third.   Plaintiffs except to the findings and conclusions of the master's report for the further reasons that the same does not conform with the evidence.   Plaintiffs pray that their exceptions hereto be considered; that this honorable court decree that the instrument given to the defendant herein named be a mortgage on said plaintiffs' land, instead of an absolute conveyance."

On May 5, 1906, the cause coming on to be heard on the plaintiff's exceptions to the master's report, and the court, being fully advised in the premises, doth sustain said exceptions.   On the 17th day of May, 1906, the court entered its decree as follows:   "Decree.   On this· day comes on to be heard the exceptions of plaintiff to the master in chancery's report of findings and conclusions, and the court, being fully

advised in the premises, and finding that it hath jurisdiction of the parties to this action and the subject-matter, doth sustain the said exceptions, and doth vacate and set aside all of said findings and conclusions, save the findings and conclusion that the intervening petition of G. H. Swanson be dismissed for want of equity, which findings and conclusions as to said petition are fully sustained and confirmed. And the court, having read and fully considered the said master's report of the evidence, and being fully advised in the premises, doth find that the supposed warranty deed described and set forth in the complaint and report of said evidence was intended by all the parties thereto to be a mortgage to secure the payment of $300 on the day of the execution of said pretended deed, loaned by the defendant company to the plaintiff Rachel A. Edwards, for which it was agreed to bear interest at 8 per cent. interest, and that said loan of $300 is now due, with interest thereon at said rate of 8 per cent. interest. It is therefore ordered and adjudged that the prayer of the plaintiff's complaint be and is granted; that said pretended deed of warranty be taken and deemed as a mortgage to secure the payment of $300 and interest at the rate of 8 per cent. per annum from the date of said deed, namely, September 9, 1905, until this date, due and payable from the plaintiff Rachel A. Edwards to the defendant Guarantee Gold Bond, Loan & Surety Company, and that she pay to said company within three (3) months from this date said sum of $300, and interest thereon at the rate of 8 per cent. per annum from said 9th day of September, 1905, to the date of such payment, and upon the payment of said amount of money the said company shall execute and deliver to said plaintiff a deed of quitclaim, releasing and remising unto her all its right, title, and claim in and to the lands described in said pretended deed, namely, the S. ½ of N. ½ of N. E. ¼, section 29, township 15 N., range 18 E. of base and meridian in the Creek Nation, Ind. Ter., being

40 acres, more or less, and upon its failure so to do then such deed shall be executed by the master in chancery for on behalf of said defendant company and be delivered to said plaintiff, Rachel A. Edwards. It is further ordered and decreed that if said plaintiff, Rachel A. Edwards, shall not make such payment within said three months, then and in such case the master in chancery of this court thall offer said described land at public sale, as is provided by statute for sale of real estate upon execution, to pay and satisfy said debt, interest, and costs of such sale, and shall pay to such defendant company the amount of said debt and interest, and shall make report of such sale to the court. It is further ordered and decreed that said land shall be sold subject to one year's equity of redemption in favor of said plaintiff, Rachel A. Edwards, and the master shall deliver to the purchaser his certificate of sale, and if said redemption shall not · be made the master shall thereupon execute deed to such purchaser or his heirs, representatives, or assigns. It is further ordered and decreed that said defendant company shall pay all the costs of this action, excepting such as may accrue under said sale, and those costs arising by reason of said intervening petition of Swanson, which it is ordered he shall pay; and that executions shall issue against said company and intervener Swanson. It is further ordered and decreed that Clark J. Tisdel, master in chancery, be and is hereby allowed as and for his fee $100 and $56.10 as fee for stenographic work herein, and that same be taxed as costs. The defendant company excepts and prays an appeal, which is allowed upon giving bond in sum of $1,000 to be filed and approved within 30 days from this day. William R. Lawrence, Judge."

On the 7th day of June, 1906, appellant files a certificate of evidence, as follows: "Be it remembered and certified that on the hearing of this cause, upon the amended bill of complaint, the answer to said bill, and the exceptions to the report of the master, that the report of Clark J. Tisdel, the

master in chancery of this court, to whom this cause was referred to take and report the evidence, together with his conclusions thereon, and the evidence returned by the said master with his report, together with the exhibits accompanying the same, was all the evidence introduced on the hearing of said cause and upon the exceptions to the report of the master. Dated this 5th of May, A. D. 1906. William R. Lawrence, Judge."

On the 19th day of May, 1906, appellant files petition for appeal, with 19 assignments of error, which petition was allowed, and also filed supersedeas bond in the sum of $1,000. On June 22, 1906, the intervener, G. M. Swanson, filed his petition for appeal, which was allowed, and filed 5 assignments of error and also filed appeal bond in the sum of $100. and the case was brought to this court by appeal.

Edgar 'A. De Maules and C. L. Thomas, for appellant savings company.

N. A. Gibson and Geo. S. Ramsey, for appellant Swanson.

A. E. Patterson and J. H. Lilley, for appellees.

TOWNSEND, J. (after stating the facts as above). Appellant the Guarantee Gold Bond, Loan & Savings Company has filed 19 assignments of error, as follows: "(1) Because the court erred in sustaining the exceptions by the plaintiffs filed to the findings of fact, as made by the master in chancery, to whom the cause was referred, and as contended in the report of the master therein filed. (2) Because the court erred in setting aside the master's findings of fact as made and contained in the report of the master herein filed. (3) Because the court erred in considering and acting upon the exceptions filed by the plaintiffs to the findings of fact. (4) Because the court erred in sustaining the first exception by the plaintiffs filed to the findings of fact as made by the master. (5) Because the court erred in sustaining the second exception by

the plaintiff filed to the findings of fact as made by the master. (6) Because the court erred in sustaining the third exception by the plaintiff filed to the findings of fact as made by the master. (7) Because the court erred in sustaining the exception by the plaintiffs filed to the finding of fact by the master made, that the warranty deed by the plaintiffs, Rachel A. Edwards and Silas Edwards, executed and delivered to the defendant Guarantee Gold Bond, Loan & Savings Company, on the 7th day of September, 1905, was in fact a deed of conveyance in fee. (8) Because the court erred in sustaining the exception by the plaintiff filed to the findings of fact by the master made, that the real consideration for the conveyance of Rachel A. Edwards and Silas Edwards to the Guarantee Gold Bond, Loan & Savings Company was in fact six hundred ($600.00) dollars. (9) Because the court erred in sustaining the exception by the plaintiff filed to the finding of fact by the master made, that no fraud was practiced upon the plaintiffs, Rachel A. Edwards and Silas Edwards, in the execution of the said warranty deed, and that the parties then and there intended said instrument to be an absolute conveyance. (10) Because the court erred in setting aside the fifth finding of fact as made by the master and in the report of the master contained. (11) Because the court erred in setting aside the sixth finding of fact as made by the master and in the report of the master contained. (12) Because the court erred in setting aside the eighth finding of fact as made by the master and in the report of the master contained. (13) Because the court erred in setting aside the conclusion of the master, in his report contained, that the warranty deed executed and delivered to the Guarantee Gold Bond, Loan & Savings Company on September 7, 1905, was the valid instrument of the said Rachel A. Edwards and Silas Edwards, and was then and there intended by them to be a warranty deed conveying in fee the premises therein mentioned, and not as a mortgage. (14)

Because the evidence showed that the warranty deed of conveyance by the plaintiffs, Rachel A. Edwards and Silas Edwards, executed and delivered to the Guarantee Gold Bond, Loan & Savings Company on the 7th day of September, 1905, was in fact a deed of conveyance in fee, and not a mortgage, and that the said conveyance was intended by the plaintiffs ·to operate as a .conveyance in fee. (15) Because the evidence tending to prove that the said deed of conveyance was in fact intended to be and to operate as a mortgage is not sufficient to support the decree. (16) Because the court erred in not sustaining the findings of fact as made by the master in chancery, court erred in not su)taining the finding of fact as made by the master, wherein the master finds as follows: That no fraud was practiced upon the plaintiffs, Rachel A. Edwards and Silas Edwards, in the execution of sbid instrument, and that the parties thereto then and there intended said instrument to be an absolute conveyance of the lands therein mentioned. (18) Because the decree rendered is against the weight of the evidence. (19) Because the decree rendered is against the law. Wherefore the defendants pray that the said decree be reversed, and that the said court may be directed to enter a decree in accordance with the facts, and for a dismissal of the bill of the plaintiffs, Rachel A. Edwards, Silas Edwards, and G. M. Swanson"—and states, under the errors assigned, there are in fact, however, but four paints to be argued, and, generally speaking, they are as follows: "(1) That the court erred in considering, acting upon, and sustaining the exceptions to the findings of fact made by the master, in the absence of a certificate of the master to whom. the cause was referred, to the effect that he had sent up with the report all the evidence given in the case and upon which he based his findings of fact. (2) That the court erred because the evidence showed conclusively that the warranty deed of conveyance by the plaintiffs, Rachel A. Edwards and Silas Ed-

wards, executed and delivered to the 'Savings Company' on the 7th day of September, 1905, was in fact a deed of conveyance in fee, and not a mortgage, and that the said conveyance was intended by the plaintiffs to operate as a conveyance in fee; and that therefore the decree rendered is against the weight of the evidence. (3) That the court erred in not according to the findings of fact made by the master that presumption of correctness to which they were entitled, and erred in setting aside the findings of facts as made by the master. (4) That the court erred because the evidence tending to prove that the said deed of conveyance was in fact intended to be and to operate as a mortgage is not sufficient to support the decree."

Appellant's first contention is that upon an exception to the master's findings of fact, in the absence of a certificate from him that he has sent up all the evidence with his report, it is impossible for the court to impeach his conclusions, and in the absence of such certificate there is no presumption that he has sent up all the evidence. Appellant, to sustain his contention, cites the case of Sheffield, etc., Ry. Co. vs Gordon, 151 U. S. 285, 14 Sup. Ct. 343, 38 L. Ed. 164. Justice Brown, in delivering the opinion of the court, said: "An interlocutory decree was entered in this case by consent, and the questions in issue arise upon exceptions to the report of the special master to whom the case was referred to take proofs, and to report the amount found by him to be due. He was not, however, required to report the testimony. Defendants excepted to so much of said report and the findings of the master in reference thereto as determined: '(1) That the defenses set up by the defendants are not sustained by the evidence' "— together with other exceptions. In discussing the exceptions, the court says: "The exceptions themselves are too broad, and amount simply to a general denial of the facts and conclusions of the master." Then the court says: "There is

another objection, however, to our exomination of the facts in this case. The order referring the case to the special master, though minute in its details, did not require him to send up the testimony; neither does he purport to do this in his report. And while a number of depositions taken before him are filed, there is nothing to indicate that these were all the testimony in the case. He finds in this connection that the defenses set up by the defendants are not sustained by the evidence, and that the petitioners, Gordon, Strobel, and Laureau, are entitled to be paid the contract price for the material. In the absence of any certificate that the entire evidence taken by the master was sent up with his report, it is impossible to impeach his conclusion in this particular." Appellant cites Morrow vs Lander, 77 Wis. 77, 45 N. W. 956, in which the court says: "There is no bill of exceptions. This being so, we must assume not only that there was evidence to sustain each and all the findings of fact, but also evidence disproving any and all inconsistent inferences." In Andrews vs Kerr, 49 Iowa, 680, the syllabus says: "In an equity case, triable de novo, the certificate of the trial judge must recite that the abstract contains, not simply the material portions, but all the evidence."

Appellant then cites Henderson's Chancery Practice sustaining the same contention, and Craggs vs Bohart, 4 Ind. Ter. 443, 69 S. W. 931. In that case, Judge Raymond, in delivering the opinion of the court, said: "In passing upon the first four assignments of error, it is necessary to refer to the record as filed in this court, to see whether or not it contains all of the evidence which was introduced upon the trial. On page 40 of the printed record will be found this statement: 'This was all the testimony introduced on the trial of this cause.' There is a dispute between counsel as to whether or not the record contains all of the evidence introduced. We cannot consider these assignments of error unless the record shows

affirmatively that all of the evidence introduced upon the trial is made a part of the record by a bill of exceptions. The statement that this was all the testimony given in the cause is not sufficient. 'The statement that the bill of exceptions contains all the evidence must be made in explicit terms. It will not be sufficient that it contains a recital that "this was all the testimony given in the case," since the word "testimony" is not synonymous with the word "evidence." ' &ast; &ast; &ast; The first four assignments of error are therefore held to be not well taken." The foregoing was an action at law, and was tried before a jury, and the first four assignments relate to the refusal of the court to admit certain testimony during the trial. In the case at bar, the exceptions being considered are the exceptions to the report of the master, in an equity case, and under the statutes of Arkansas adopted and put in force in this jurisdiction there are certain provisions that affect and regulate the reports of masters in chancery, as follows:

Sec. 5266, Mansf. Dig. (sec. 3471, Ind. Ter. Ann. St. 1899): "He shall reduce to writing the testimony of all witnesses examined by him, and shall have power to commit such witnesses as may refuse to testify."

Sec. 5267 (sec. 3472): "Depositions, regularly taken in a cause, may be read in evidence before the master, where the cause has been referred to him."

Sec. 5269 (sec. 3474): "If either party shall except to the competency of any witness, or to the admission or exclusion of any evidence, the master, if required, shall state the particulars of the exceptions in his report."

Sec. 5270 (sec. 3475): "The master shall report on all cases referred to him as speedily as possible, reciting in his report the order of the court referring the cause to him, the notice to the parties, the time and place of stating the account or taking depositions, and all other proceedings had therein, and return th same, together with the testimony, to the court.

The report shall be in sheets, neatly and securely stitched together."

Sec. 5271 (sec. 3476): "All exceptions to the master's report shall be in writing, and shall be made within four days after the first day of the term of the court at which the report is made, if the term so long continue, and if not, befge the end of the term, and shall be disposed of without delay."

Sec. 5272 (sec. 3477): "The report shall stand good, except such parts as are excepted to, unless it shall appear on the face of the report or from the evidence in the cause that it is erroneous."

Sec. 5273 (sec. 3478): "Exceptions may be allowed to the master's report where he admitted incompetent testimony, or where he excluded competent testimony, or for any other cause which may be adjudged good by the court, or when it shall be apparent from the face of the report that injustice has been done."

Hence it is conclusive in this juirsdiction that exceptions may be allowed for any other cause which may be adjudged good by the court, or when it shall be apparent from the face of the report that injustice has been done. In the case at bar, it was referred to the master in chancery under the following order: "Now, on this day, the 15th of January, 1906, it is ordered by the court that all equity cases wherein issue has been joined be and the same are hereby referred to Clark J. Tisdel, the master in chancery of this court, to take evidence and report, with conclusions of law and fact therein." In the case of Schumann vs Helberg, 62 Ill. App. 218, 221, it is said: "Where a cause has been referred to a master to take and report the evidence, it is meant that he shall take all the evidence, and it is not competent for the court to hear other evidence when the cause comes on to be heard upon the master's report. Cox vs Pierce, 120 Ill. 556, 12 N. E. 1964; Allison vs Perry, 130 Ill. 9, 22 N. E. 492; Gould vs Elgin City Banking Co., 36

Ill. App. 390." In Morey vs Warrior Mower Company, 90 Ill. 307, it is stated in the syllabus: "The proceedings before a referee, being statutory, must, in all substantial respects, pursue the statute, or they cannot be sustained. The statute authorizes no report by a referee, except one containing the evidence heard, and giving the referee's conclusions thereon, to which the parties are entitled to be heard on exceptions. If the report fails to give the evidence, no judgmnt can be entered on it." In Kent vs Dakota F. & M. Ins. Co., 2 S. D. 301, 50 N. W. 88, it is said: "Counsel for appellant contends that * * * referees must report their findings, 'together with all the evidence taken by them, and all excepions taken on the hearing.' This provision is no doubt mandatory, and must be complied with, and, if the fact that a judgment was rendered when the evidence had not been reported affirmativly appeared in the recgd, and a proper motion had been made in the court below, an important question would be presented to the court. * * * While appellant's exception asserted in the court below 'that no evidence whatever is certified, reported, or submitted to this court by the referee, and there is now no evidence properly before this court upon which this court can review,' etc., there is nothing in the record to show that the evidence was not reported, and was not before this court at the time the motion for judgment was heard and decided." In Brueggestradt vs Ludwig, 184 Ill. 24, 56 N. E. 419, the syllabus states: "An objection that the chancellor considered depositions that were not produced before nor considered by the master cannot be sustained, where the order of reference directed the master to consider all the testimony that had previously been taken in the cause, among which were the depositions in question, and there is no affirmative showing that the master disobeyed the order of reference. And in the absence of any showing to the contrary it will be presumed that the master complied with the order of reference" —citing, also, Shaw vs Wise, 166 Mass. 433, 44 N. E. 345.

The master in his report states as follows: "This cause came on for hearing before me at my office at Muskogee, in this district, on March 21, 1906, after due notice to all the parties, and the plaintiffs in person and by Messrs. Patterson & Lilley, their attorneys, and the intervener, G. M. Swanson, appearing in person and by Messrs. Gibson & Ramsey, his attorneys, and the defendant appearing by Messrs. Thomas & De Meules, its attorneys, the following witnesses were produced by the parties, duly sworn and examined, and their testimony, which was taken in shorthand, is reduced to writing, and is attached hereto and made a part of this report"—giving the names of four witnesses for the plaintiffs, two witnesses for the intervener, and four witnesses for the defendant. On the 24th of March, 1906, a further hearing was had, in which the master certifies that the witnesses were sworn, and their testimony, which was reduced to writing, is attached hereto and made a part of this report, giving the names of four witnesses for the plaintiff, one for the intervener, and one for the defendant. Then the master states that this cause came on for hearing before "me at my office on March 31, 1906," all the parties hereto being represented by counsel, at which time the master heard the arguments of counsel upon the issues joined herein and upon the evidence introduced, and says: "From the pleadings in this cause, the testimony of said witnesses, the documentary evidence introduced, and the arguments of counsel, I find the facts in this case to be as follows." The statute in this jurisdiction having prescribed the master's duty, and the order of reference having been made of this case to the master, we are of the opinion that, unless it affirmatively appears that he has not discharged that duly and complied with the statute, the presumption is that he did comply; and that assignment, that the court, in considering, acting upon, and sustaining the exceptions to the findings of fact made by the master, in the absence of a certificate from the master that he had sent up

with the report all the evidence given in the case, and upon which he based his findings of fact, is noot well taken.

The second contention of appellant is as follows: "The court erred because the evidence shows conclusively that the warranty deed of conveyance by plaintiffs, Rachel A. Edwards and Silas Edwards, executed and delivered to the savings company on the 7th day of March, 1905, was in fact a deed of conveyance in fee, and not a mortgage, and that the said conveyance was intended by the plaintiff to operate as a conveyance in fee, and that therefore the decree rendered is against the weight of the evidence." Appellant then says that the first and second exceptions to the master's findings of fact go to the correctness of the above proposition, and the court erred in sustaining these exceptions. From an examination of the testimony of the appellee, it is apparent that Rachel A. Edwards is an ignorant woman, can read but little, and is barely able to write her name. Dr. W. H. Sims, with whom the transaction seems to have been made, is cashier of the appellant. On the 7th of September, 1905, when the appellee Rachel A. Edwards went to appellant's bank, it is conclusively shown that she desired to borrow $300. The contention of the appellant is that after asking for a loan of $300, and ascertaining she could not procure the loan that day, she said she must have $300 then, and he (Dr. Sims) said he could buy her land. "Q. What did he say? A. He said he could buy her land. He said he could loan her the money, but not for two or three days, but he said: 'I can buy your land.' And she said: 'All right.' He went out and returned in a few minutes and asked me for a warranty deed." This was testified to by Dr. Sims, and by Lena Lannigan, his secretary. But Rachel Edwards, on that subject, testified as follows: "Q. You may state whether Dr. Sims drew any paper while you were in his bank on that day, and asked you to sign it. A. Mr. Sims, he written out a paper, a mortgage he called it. He

said it was a mortgage. That is what he said. Q. Did you sign the instrument that you say Dr. Sims drew up? A. Yes, sir; I signed that. I signed my name to the paper he called a mortgage." Silas Edwards testified that Dr. Sims told him it was a mortgage. "Q. What was the character of the paper that you signed? A. Dr. Sims told me it was a mortgage." It is conclusively shown that the paper signed and executed by the appellee was not a mortgage, but a warranty deed, and it is the contention of the appellee that Dr. Sims knew it, and that if he told her the true character of the instrument she would refuse to sign it; but it is the contention of the appellee that Dr. Sims, the cashier of the appellant, and Lena Lannigan, his secretary, are the only ones that contradict that testimony of the appellees, Rachel and Silas Edwards.

A. B. Randle, a witness for the appellee, states that Dr. Sims told him that Rachel Edwards had borrowed $300 from him, and that there was a little misunderstanding between them. "Q. You may state what was said in that conversation. A. He proposed to me that Rachel A. Edwards had borrowed $300 from him, and that there was a little misunderstanding, he said, between them, and he says: 'I want you to get two other men, and yourself, or as many as you like, and come and bring Mrs. Edwards before me and let us fix this matter up. We can fix it among ourselves.' Q. You say that Dr. Sims told you that he had loaned Rachel Edwards $300? A. That he gave her a check for $300, the same thing. Q. What did he say? A. He said she came to him for $300, and he didn't have it in the house, and he just gave her a check for it. Q. Did he say anything about having bought her land? A. No, sir." Caesar Morrison testified that he had a conversation with Dr. Sims subsequent to the transaction. Dr. Sims told him that he had loaned Rachel Edwards $300, or that Rachel had borrowed $300, for which he had charged her $50. It appears, from an examination of the deed executed

by Rachel A. Edwards and her husband to the appellant, that
the consideration therein stated was $2,450, but it is contended
by the appellee that the original consideration was $300 or
$350, and that it was subsequently changed by Sims, the cashier
of the appellant, to $2,450.

S. F. Utsey, a witness for the appellee, testified as follows:
"Q. Do you know anything about a certain transaction
alleged to have taken place in the Guarantee Gold Bond, Loan
& Savings Company's office, on or about the 7th day of last
September? A. I witnessed it on or about that date. I
judge it is the same one you are talking about. Q. You may
state, if you will, what took place there that day between
the plaintiffs and the defendant in this action. A. Well, I
simply went down with Rachel to this bank, and was called
upon to witness a paper there, which I did, and when my atten-
tion was first drawn to it afterwards was when I saw the con-
sideration in the deed. There was a discrepancy between
what I saw when I signed the paper, and my attention was first
drawn to it afterwards when I saw the paper, when it was filed
for record. There was a discrepancy in the consideration.
Q. I understand you to say that you were called upon to
witness the instrument signed by Rachel A. Edwards? A.
Yes, sir. Q. Do you know what the instrument purported
to be? A. I know what it was stated what it was. It was
a warranty deed. Q. Do you know what consideration
was stated in the deed at the time it was signed by Rachel
and Silas Edwards? A. $350. Q. What, if anything, did
Mr. Sims say in reference to the transaction? A. I don't
remember that I heard him say anything. I don't remember
of anything that he said. All I know and what he did say
was he sent a note to me that morning. Q. That he sent you?
A. Yes, sir. Q. Did you read the note? A. Yes, sir.
Q. What was contained in the note? A. I don't remember
the exact wording, but the substance of it was that he would

let her have $300. I don't remember the exact words of it. It was, I considered, unimportant. Q. Was it addressed to you? A. I think it was. Q. Who was the bearer of that note from Dr. Sims to you? A. Rachel herself, I think. Q. She brought the note to you and delivered it? A. Yes, sir; I think so. Q. What did you do upon having received the note? A. I think it was very soon after that we went down to the. bank. Q. Why did you go to the bank? A. To get the $300. Q. You may state whether or not subsequent to this transaction you had any conversation with Dr. Sims relative to it. A. No, I had no conversation. Q. Afterwards, I say? A. It was a couple of days afterwards I had a conversation with him. Q. Relative to this same transaction? A. Yes, sir. Q. State what was said. A. It was after I seen it on record, and I asked him why it was that there was such a discrepancy in the consideration, and he made a somewhat short answer to me, in fact he didn't give me any answer at all. Q. Did he make any statement to you regarding this transaction? A. No, sir; he didn't give me any satisfactory answer at all. I told him I didn't understand there was such a large consideration, such a change from what it was in the deed I witnessed. Q. Was the original deed, which you have testified about, filled out in longhand or in typewriting? A. It was typewritten, I think, in fact I am sure it was. Q. Who was present at the time of its execution? A. Silas and Rachel Edwards, myself, and Dr. Sims and his lady stenographer. Q. At whose instance did you sign the deed as a witness? A. Dr. Sims'. Q. State whether or not you read the instrument. A. I did."

Dr. Sims testified for the appellant as follows: "Q. You heard the testimony of Mr. Utsey yesterday regarding the conversation you had with him subsequent to this transaction about two days? A. Yes, sir. Q. Where was that conversation? A. In the bank. Q. Now briefly detail that.

A. Well, Mr. Utsey came in and said: 'I have come to see about that Rachel Edwards matter.' And I asked: 'What matter?' And he said: 'That deed I witnessed.' And I said: 'Well, what about it?' And he says: 'The consideration is changed.' And I said to him: 'That is not true.' And I said I had been informed that he had gone around and told parties that the consideration was only $300, and I had changed it to $2,450, and he said: 'I didn't say it.' And I said: 'You did say it.' And he again said he didn't, and asked who told me, and I told him he was as good as acknowledging he said it now. I said: 'If you say that you are a liar.' And he denied saying that. Q. What? A. That the consideration was $350; and, of course, he started to strike me, and I got ready for the strike, and he went out. Q. I will ask you when you wrote that deed whether or not you at any time before the deed was signed made any erasures on that deed? A. Yes, sir. Q. I will ask you to point out specifically what erasures were made on that deed at any time before the signatures, by you? A. There was three or four. In writing 'twenty'—Q. Of the consideration? A. Yes, sir; of the above consideration, I don't handle the typewriter very well and I started to write the 'twenty' on the edge of the printed matter, and then I erased it and put it on the line where it ought to be, and on further down on the deed Mr. Utsey had written, 'Western District,' and I wrote it in in the wrong place, and I changed it, and two or three or other little errors I made in writing the instrument. Q. I will ask you what you paid Rachel Edwards for that land? A. Why I paid her $600. I agreed to pay her $600, and started to pay her $300 in cash, and thought I had better protect myself, so I gave her a check on the Commercial National Bank, where we would have a record of it. Q. Did you deliver that check to her? A. I did, and then made her a deposit slip for $300, which she now has. Q. I will ask you whether or not that

check was ever paid? A. It was taken from my account, but I never got the check back. Q. Explain. A. When my book was balanced it was charged to my account. Q. By whom? A. The Commercial National Bank."

In the testimony of Rachel Edwards, it is stated: "Q. What did you do with that check? A. That check we took over to the First National Bank, but they wouldn't take it there, and then we carried that check over to that other bank, and we left the check right there. Q. What else did you leave there, if anything? A. The check was the onliest thing. Q. How did you happen to leave the check there? A. We left the check there for safe-keeping, until we got back. Q. You swore in that complaint that you borrowed $350 from Dr. Sims, and he was to charge you $50 for using the money for a year, is that true or not? A. I didn't get no $350. I just got $300. Q. Did he (Sims) ever say anything to you about turning the land over to him? A. No, sir; Mr. Sims said he would turn the land back to me if I would bring the $300; he said that. Q. How much time did he give you to pay back the $300? A. The agreement was with I and Mr. Sims for one year, and I told him, if I should bring the money back before the year was up, would it be all right? Q. When was the first time you heard anything about Dr. Sims having $300 down there to your credit in his bank? A. I didn't know anything about that. That is what I heard Dr. Sims say, but he never told me. Q. Is this the first time? A. Yes, sir. Q. You didn't know then that Dr. Sims did claim to owe you $300? A. No, sir. Q. This is the first time you ever knew about it? A. Today is the first time, but he never told me. Q. Have you any paper, deposit slip, or any other paper? A. That paper that Dr. Sims gave us we turned back to him. Q. Is that the one you took up to Mr. Moore's office? A. Yes, sir.

Dr. Sims testified: Q. You borrowed some money

from Holmes & Hibbard the next day on this? A. Yes, sir.
Q. How long did it take you to get that loan through? A. A
couple of days. Q. Don't you know that the mortgage
was made the next day, and recorded the same day, on the
piece of land? A. They made the mortgage and recorded it.
Q. Before they paid it? A. They usually do. Q. How
much did you borrow? A. What I paid Rachel. Q. Only
$600? A. Yes, sir. Q. Ever talk to Rachel about this
since the suit was filed? A. I have tried to talk to her, but
she wouldn't talk to me. Q. Isn't it a fact that you have
offered her $1,500 in addition to this $600 which you agreed
to let her have, if she would testify in this case that there was
a voluntary sale of this land to you? A. No, sir. Q. What
sum of money have you offered her in addition to the $600?
A. During a talk with her attorneys and my attorneys, we
thought that it would be better to compromise this suit than
to spend it all with a lawsuit, so I offered to give her a thousand
dollars more. Q. It was a bona fide sale of the land she
made to you, was it? A. Yes, sir. Q. You had no fear of
your title being affected in any way by the result of the suit?
A. Yes, sir; I am afraid of smart attorneys. Q. Is there
any entry upon the books of your bank of any account as
to this land transaction, except the $300 credit which you
showed here yesterday on the individual ledger? A. Not
only but the check I sent the Commercial National Bank,
entered on my check register. Q. But you said this afternoon
that the check never had come back to you? A. But when
my book was balanced the Commercial National give me a
receipt for it, and took $300 from my account. Q. Did you
ever balance your bank book? A. My cash account; yes, sir.
Q. Now how did you make your cash account balance when
you paid out $600 and didn't take in anything? A. Well, you
see we have what you call a check register. Q. Now you
did draw a check for $300, which was deposited to her credit?

22

A. No, sir. Q. How does the check register show that? A. That was in reference to the check sent to the Commercial National Bank. Q. Where did that check for $300 come from? A. From the bank, of course. Q. In what way? A. Just out of the funds of the bank. Q. Did you charge it to your cash account? A. Yes, sir. Q. On what? A. On my cash register. Q. You stated just now that you had not been able to find that, that you didn't make any entry? A. I meant to say on the expenditures that day, I thought on my expenditure book for that day. Q. Now, as a matter of fact, you haven't it on any book at all except on this individual ledger, this $300 credit? A. The cash on hand is, and if I got to pay it out it would appear on my check register. Q. Did you make a deposit slip or take the deposit for $300? A. Yes, sir. Q. What date? A. September 7th. Q. Now, on the book you showed here yesterday there was no credit checks at all to any of your depositors on the page on which this woman's name appeared of the date of September 7th; there being a skip between the 6th and the 8th. When your deposit slip showed it dated the 7th, why didn't you enter it under the corresponding date? A. I don't know why, unless it may not have been the 7th. I may have made a mistake in the date. Q. You remember, don't you, that there were no credits entered on the 7th at all in the case you showed us yesterday? A. I post my books sometimes every other day. It depends on the number of checks I have drawn. Q. When you do post them, you post them all under the date of the day you do the posting, regardless of the date of the check? A. Yes, sir. Q. Has this $300 deposit ever appeared on your cash book at any time? A. Yes, sir; certainly there is some cash there. Q. Have you ever charged it to anything? A. No, sir. Q. How do you make that cash balance then? A. Why I simply see the amount of cash on hand, and the amount paid out, and I keep the amount of cash

on hand on one side, and the amount paid out on the other. Q. I thought when you left here you was going to bring up the book showing some entry of this $300. Will you now produce that book? A. No, I didn't have it. Q. You can't find it? A. No, sir. Q. Have you ever balanced your cash book since the 7th of September, 1905? A. I balanced it in my way. Q. Have you ever found that your book was short for $300 on account of this transaction? A. No, sir."

The evidence in this case is to the effect that the 40 acres of land which the appellant claims to have purchased for $600, and which the appellee contends was a mortgage for $300, was of the value of somewhere near $2,000. It is clear that $300 in cash was all that was paid. From the method of bookkeeping, as testified to by the cashier of appellant, it is not clear that any credit of an additional $300 was given to the appellee. She positively says she never received the deposit slip, and had never heard of it until the day the testimony was taken. And under the statute in force in this jurisdiction, which allows exceptions for any cause which may be adjudged good by the court, or when it shall be apparent from the face of the report that injustice has been done, we think the court below was justified in holding that the assignment of error under the second proposition stated by appellant was not well taken.

The third proposition discussed by appellant in his assignments of error is as follows: "The court erred in not according to the findings of fact made by the master that presumption of correctness to which they were entitled, and erred in setting aside the findings of fact as made by the master." The appellant then proceeds to cite authorities that great weight is to be attached to the findings of a master, and that the findings of a referee or master are conclusive upon the court, and cites many authorities to sustain his contention. But in the case at bar the court stated, when considering the exceptions to the master's report, that he had read and carefully considered

the master's report of the evidence, and, being fully advised
in the premises, doth find the supposed warranty deed described
and set forth in the complaint and report of said evidence,
and was intended by all the parties thereto, to be a mortgage,"
etc.   And it is provided by section 5272 of Mansfield's Digest
(Ind. Ter. Ann. St. 1899, § 3477) that "a report shall stand
good, except such parts as are excepted to, unless it shall
appear on the face of the report, or from the evidence in the
case, that it is erroneous."   In Henderson's Chancery Practice,
§ 487, discussing the weight given to a master's report, and
the rule in the state courts, it is said: "These Illinois cases
holding that a master's findings are only advisory to the court,
constitute no departure from the general rule.   By the use of
the words 'only advisory,' the court simply mean that the
master's findings are not conclusive upon the court, but, on
the contrary, his conclusions both of law and fact may be
reviewed by the chancellor, or, as said in a federal case:   'The
conclusions of the master do not bind the court on any questions
of law or fact'—citing In re Thomas (D. C.) 35 Fed. 337-339.
The court does not hold, and does not mean to be understood
as holding, that the chancellor can treat the master's findings
as advisory only, in the sense that the chancellor may arbitrarily
or capriciously set aside the master's conclusions, but what
is meant is this:   Upon exceptions taken to the master's findings
of fact, the duty is devolved upon the court of examining the
whole evidence bearing upon the question, and if after taking
into consideration the fact, if it be a fact, that the master had
the advantage of seeing the witnesses upon the stand and
hearing them testify, the chancellor is satisfied that the master
had committed error or mistake, or has found against the weight
of the evidence, he may set the master's conclusions aside, and
make his own findings from the evidence, or re-refer the cause
with further directions."   In Medler vs Albuquerque Hotel,
etc., Company, 6 N. M. 331, 28 Pac. 551, it is stated in the

syllabus:    "*    *    *    Where the case was referred to a master to take proof and report with his findings thereon, the chancellor, on exceptions made to the master's report, did. not err in refusing to give any weight to the findings of the. master, but was justified in considering the testimony as though. it had been originally heard by himself." And in the opinion they state: "The question is now presented, however, what, if any, weight is to be given the findings of the master as to facts when the chancellor has found differently than he had? It would seem inevitable from the foregoing holding that the findings of the master must in such a case be entirely repudiated' and that we can only consider the testimony and the findings, if any, of the chancellor. But what weight is to be given the findings of the chancellor? The reason usually advanced for giving so much weight to the findings of a master—that he heard the witnesses, and beheld their demeanor upon the stand—does not apply to the case of the chancellor. Why, then, should any weight be given to his determination? Ought not this court, having all the evidence before it, as did the chancellor, pass upon it, unbiased by any presumptions or weight growing out of the chancellor's findings? The court think not, but consider that we should give some weight to the findings of the chancellor, and not reverse those findings unless clearly opposed to the evidence." In Lyons & Cooney vs Harris & Johnson, 73 Iowa, 292, 34 N. W. 864, it is said: "The plaintiffs insist that the court below erred in setting aside the findings of fact above stated, to the effect that the checks were not taken into the account in the dissolution of the firm. Upon this point the evidence is not clear, but we are inclined to think that it supports the finding of the referee; but when a verdict is set aside by the court below, this court will reluctantly interfere, and will do so only when there is nothing found in the record to support the ruling." The statutes in force in this jurisdiction undoubtedly invest the courts with large dis-

cretionary power in considering exceptions to the master's report, and we are of the opinion that all the cases, with scarcely an exception, give to the court the right to review the evidence and reverse the findings of the master where the ends of justice may require it. Apart from the statute, the true rule appears to be that the findings of masters in chancery are only prima facie correct, and only advisory to the lower or Appellate Court where the evidence accompanies the report. We are therefore of the opinion that the third assignment of error is not well taken.

The fourth proposition of the appellant is that "the court erred because the evidence, tending to prove that the said deed of conveyance was in fact to be and to operate as a mortgage, is not sufficient to support the decree." In Haas vs Nanert (Super. Buff.) 2 N. Y. Supp. 723, it is stated in the syllabus: " 'The rule that the evidence to establish that a deed absolute on its face is a mortgage must be clear, unequivocal, and convincing,' establishes no certain standard of evidence; the question being merely whether the evidence of extrinsic facts shown is sufficient to rebut the presumption that the deed is what it purports on its face to be. Where it appears that the evidence might fairly warrant a finding that the presumption arising on the face of the deed, as well as the adverse testimony, was overcome, a judgment declaring the deed a mortgage will not be disturbed on appeal." We have examined many authorities upon this point, and we find they are in great confusion. All authorities agree, however, that the evidence of most intrinsic value is that of the circumstances under which the transaction was had. The uncontradicted evidence in the case at bar shows that the appellee Rachel Edwards wanted to borrow money; that she applied to appellant for a loan; that she needed $300, and that amount only. Sims offered her $600, but she declined to take that sum, and he states in his testimony she was willing to take just $300. "I

said: 'I will give you more than that.' I asked her if she had any other money, and she said: 'I have got $300, and I am going to use that too.' I said: 'I will give you $600.' And she said she didn't want that. And I said: 'You can have it on deposit.' And she said, 'All right'." The circumstances surrounding the transaction, as shown by the testimony, the property being valued in the neighborhood of $2,000, the appellee desiring to secure a loan of only $300, as appears from the testimony of Sims, cashier of appellant, he himself proposing to give her $600, then the consideration stated in the deed was $2,450, the cashier having stated that he gave her a deposit slip for $300, which she says she never heard of until the cashier testified on the trial before the master, that she had no knowledge that there was $300 on deposit, and the further fact that appellant's books upon examination did not show any entry in regard to the $300, in our judgment furnishes ample cause why the court below adjudged that the exception to the master's report was good, and furnishes ample reason for him to determine from the face of the report that injustice had been done the appellee. It is our judgment, therefore, that the fourth assignment of error was not well taken.

The intervener, G. M. Swanson, one of the appellants, has filed five assignments of error, as follows: "First. The court erred in dismissing the petition of the intervener, G. M. Swanson, the appellant herein, filed in said cause on March 20, 1906. Second. The court erred in not entering a decree in this cause adjudging the rights and liabilities of all the parties, including the appellant as the intervener under his said petition. Third. The court erred in sustaining the master's report, wherein said master's recommended the dismissal of the intervener's petition, because from the evidence in the cause the report of the master is erroneous. Fourth. The court erred in not entering a decree adjudging the intervener, the appellant, the owner of the land in controversy under a deed

executed and delivered by plaintiffs, Rachel A. Edwards and Silas Edwards, to the intervener, on September 9, 1905, as shown by the record, subject to the deed of defendant Guarantee Gold Bond, Loan & Savings Company as a mortgage in effect to secure a loan of $300, as held by the court. Fifth. The court erred in not entering a decree ordering the defendant Guarantee Gold Bond, Loan & Savings Company to convey said property to appellant upon payment of the debt owing it by plaintiff Rachel A. Edwards, to wit, $300, with interest."

Appellant in his argument contends that he filed his intervention under Mansf. Dig. § 4946 (Ind. Ter. Ann. St. 1899, § 3151), which is as follows: "Where in an action for the recovery of real or personal property any person having an interest in the property applies to be made a party, the court may order it to be done." It may be observed that the action in this case was not for the recovery of real property, but was an action to have an absolute deed declared to be a mortgage. Appellant Swanson, however, insists that, because neither the plaintiff nor the defendants in the case either filed demurrer or answer to his intervening petition, it is therefore to be taken as confessed. The prayer of his petition was as follows: "Premises considered, intervener prays that this petition be filed by permission of the court, and he be made a party to this case; that a reference to the master, proof taken, and report made, showing fully the nature of said transaction between plaintiff and defendant; that said deed executed to defendant by the plaintiffs on September 7, 1905, be declared in fact and in equity a mortgage to secure a loan of $300 by defendant to the plaintiff with a $50 commission thereon; that said amount of money due the defendant by the plaintiff be definitely ascertained and reported and the rights and liabilities of all the parties settled and adjudged in this case. He prays for all such other, further, and general relief as justice may demand under the premises." It appears from the prayer

of the petition that he joined with the plaintiff appellee to have the deed executed to the appellant on September 7, 1905, declared in fact and in equity a mortgage to secure a loan of $300 to the plaintiff, with a $50 commission thereon; that said amount of money due plaintiff by the defendant be definitely ascertained and reported, and the rights and liabilities of all the parties settled and adjudged in this case. And appellant Swanson states that: "The master in his report having concluded that the said deed of September 7, 1905, was not a mortgage, but in fact a deed, recommended that Swanson's petition be dismissed for want of equity. We concede that if said instrument executed on September 7, 1905, was in fact a deed, then the petition of Swanson should have been dismissed for want of equity, because he acquired no rights or title by virtue of the deed made to him by plaintiffs." If the master found against the contention of Swanson, and thereby disregarded his prayer that the deed be declared a mortgage, should he not have objected to the dismissal of his petition and filed his exceptions to the master's report? The intervener, Swanson, prayed in his petition that the rights and liabilities of all the parties be settled and adjudged in this case. Said intervener had introduced testimony, and exhibited a deed purporting to have been executed to him by appellants, Rachel A. and Silas Edwards; but the record shows this evidence to have been successfully contradicted, and from the record the court was enabled to reach the decision that the said intervener had acquired no rights in the premises, and therefore his petition to have alleged rights enforced was properly dismissed.

Intervener's fourth assignment was that the court erred in not entering a decree and adjudging the intervener, the appellant, owner of the land in controversy under the deed executed and delivered by plaintiffs; Rachel A. Edwards and Silas Edwards, to him on September 9, 1905, subject to the deed of defendant savings company as a mortgage in effec

to secure a loan of $300, as held by the court; and the fifth assignment is that the court erred in not entering a decree ordering defendant savings company to convey said property to appellant upon payment of the debt owing it by plaintiff Rachel A. Edwards. The evidence in the case shows that the intervener, G. M. Swanson, sent for Rachel and Silas Edwards two days after they had borrowed $300 from the Savings company, and told them that Sims, of the savings company, was about to sell their land, and that the savings company had a deed to the same, and while he (Swanson) was abusing Sims and declaring his friendship for Rachel Edwards, whom it appears he had never seen before, said appellant Swanson asked her to sign an affidavit, in order that he might prevent the savings company from selling her land. She readily assented, and executed what she supposed to be an affidavit, but what was in fact a warranty deed purporting to convey to the said Swanson the land in question. The evidence clearly establishes that said Swanson was guilty of gross fraud, and explains why the court did not enter the decree adjudging him the owner of the land in controversy. He had paid nothing, not even the $1 stated as the consideration in the deed, and there was no evidence of a written agreement to pay for the land.

When the court reversed the findings of the master with reference to the savings company, and held the instrument in writing executed to them by Rachel and Silas Edwards to be a mortgage, the question immediately arose: Should the court have dismissed the intervening petition of Swanson for want of equity? Without doubt the court was warranted in doing that, as it undoubtedly appeared to the court that Swanson took nothing by his deed; the same having been secured through fraud and misrepresentation. Intervener relies upon section 5072 of Mansfield's Digest (Ind. Ter. Ann. St. 1899, § 3277) to support his contention that, as his petition was neither answered nor demurred to, it must be taken to be

true.    Admitting for the moment that he has a ground for his contention, it is too late to raise that question for the first time on appeal.    Rachel Edwards, the appellee, had sued the savings company, appellant, to have a certain deed declared a mortgage, and the accomplishment of the object sought by the plaintiff in the suit would not have been prejudicial to the rights of the intervener, Swanson.    Indeed, no rights could accrue to him under his so-called deed until this end had been accomplished.    Intervener's transaction was subsequent to and independent of that between the savings company and Rachel A. Edwards, so that in law the intervener had no right whatever that could be protected in this case, no right that could arise until the savings company deed had been declared a mortgage.    By what right, then, was Swanson made a party to the issue, which in no wise affected his rights?    His petition imposed upon appellees no duty to answer or demur.    In Taylor vs Taylor, 3 Bush (Ky.) 118, it was held that no answer was required to such a petition.    "It is to be regarded as traversed by all parties."    Intervener found the issue joined between Rachel A. Edwards and the savings company, and no decree rendered on that issue could by any possibility have affected the rights of the intervener.    Carter vs City of New Orleans (C. C.) 19 Fed. 659.

The court reviewed the record and the transcript of the evidence as taken before the master, which shows plainly intervener's flagrant attempt to filch the land in question, and how utterly he failed to impart any color of honesty or good faith to his transaction.    We are of the opinion that Swanson's assignments of error should be dismissed because of his failure to file exceptions to the master's report, and because the evidence adduced at the hearing does not warrant that his contention should prevail.

The judgment of the court below in sustaining the report of the master in dismissing the petition of intervener, Swanson,

for want of equity, is sustained, and the judgment of the court below should be, and is hereby, affirmed.

GILL, C. J., and CLAYTON, J., concur.